# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| RECENTIVE ANALYTICS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>FOX CORPORATION and<br>FOX BROADCASTING COMPANY, LLC,<br><br>Defendants. | Civil Action No. 22-1545-GBW |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND 35 U.S.C. § 101

*Of Counsel:*

Pillsbury Winthrop Shaw Pittman LLP

Michael E. Zeliger
Ranjini Acharya
2550 Hanover Street
Palo Alto, CA 94304
(650) 233-4500
michael.zeliger@pillsburylaw.com
ranjini.acharya@pillsburylaw.com

Evan Finkel
Michael S. Horikawa
725 S Figueroa St – 36th Floor
Los Angeles, CA 90017
(213) 488-7307
evan.finkel@pillsburylaw.com
michael.horikawa@pillsburylaw.com

Francis DiGiovanni (No. 3189)
Thatcher A. Rahmeier (No. 5222)
Faegre Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 467-4200
francis.digiovanni@faegredrinker.com
thatcher.rahmeier@faegredrinker.com

*Attorneys for Defendants Fox Corporation and Fox Broadcasting Company LLC*

Dated:  February 10, 2023

TABLE OF CONTENTS

Page(s)

I.      Introduction ............................................................................................................ 1

II.     Nature and Stage of the Proceedings .................................................................... 1

III.    Summary of Argument ........................................................................................... 2

IV.     Factual Background ................................................................................................ 2

        A.      The Patents-in-Suit ...................................................................................... 2

        B.      Prosecution History of the Patents-in-Suit ................................................. 5

V.      Legal Standard ....................................................................................................... 7

VI.     Argument ................................................................................................................ 8

        A.      *Alice* Step One: The Claims Are Directed to an Abstract Idea ............................. 8

                1.      The Claims Are Directed to the Automation of an "Entirely Manual"
                        Process ............................................................................................... 9

        B.      *Alice* Step Two: The Claims Include No Inventive Concept ............................. 12

                1.      Recitation of a "Computer" or "Computer Processors" in the Claims of
                        the Patents-in-Suit Do Not Confer Patent Eligibility .............................. 13

                2.      Recitation of a "Machine Learning Technique" in the Claims of the
                        Patents-in-Suit Does Not Confer Patent Eligibility ................................ 15

                3.      The Order of the Steps of the Method Claimed in the Patents-in-Suit
                        Does Not Confer Patent Eligibility ......................................................... 17

                4.      The Dependents Claims of the Patents-in-Suit Do Not Contain Any
                        Inventive Concept .................................................................................. 17

VII.    Conclusion ........................................................................................................... 20

i

# TABLE OF AUTHORITIES

Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) .................................................................................................. 8

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
  838 F.3d 1253 (Fed. Cir. 2016) ............................................................................................ 8, 13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  573 U.S. 208 (2014) ......................................................................................................... passim

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................... 7

*Bilski v. Kappos*,
  130 S. Ct. 3218 (2010) .............................................................................................................. 2

*Blackbird Tech LLC v. Advanced Discovery Inc.*,
  No. CV 16-413-GMS, 2017 WL 2734725 (D. Del. June 26, 2017)........................................ 10

*Cogent Medicine, Inc. v. Elsevier Inc.*,
  70 F. Supp. 3d 1058 (N.D. Cal. 2014)..................................................................................... 10

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
  776 F.3d 1343 (Fed. Cir. 2014) ................................................................................... 3, 7, 9, 18

*Dealertrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed. Cir. 2012) ............................................................................................ 2, 13

*Eagle View Technologies, Inc. et al. v. Roofr, Inc.*,
  2023 WL 315633 (D. Del. Jan. 19, 2023) ..................................................................... 11, 12, 13

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ................................................................................................. 8

*Genetic Techs. Ltd. v. Merial LLC.*,
  818 F.3d 1369 (Fed. Cir. 2016) ................................................................................................. 7

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed. Cir. 2015) ........................................................................................... 11, 20

*Intellectual Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) ............................................................................................... 10

*Mortg. Application Techs., LLC v. MeridianLink, Inc.*,
  2021 WL 97347 (Fed. Cir. Jan. 12, 2021)............................................................................... 10

*Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*,
  811 F.3d 1314 (Fed. Cir. 2016) ............................................................................................... 10

*Nuance Comms., Inc. v. MModal LLC*,
No. 1:17-cv-1484-MN-SRF, 2018 WL 6584129 (D. Del. Dec. 14, 2018)............................................11

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) ................................................................................................12

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) .............................................................................................. 8, 10

*Power Analytics Corporation v. Operation Technology, Inc.*,
2017 WL 5468179 (C.D. Cal. July 13, 2017), *aff'd sub nom*.................................... 15, 16, 18

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017) ................................................................................................8

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ..................................................................................................7

*Sound View Innovations, LLC v. Facebook, Inc.*,
204 F. Supp. 3d 655 (D. Del. 2016) .........................................................................................5

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
916 F.3d 1363 (Fed. Cir. 2019) ................................................................................................8

*Williamson v. Citrix Online, LLC*,
212 F. Supp. 3d 887 (C.D. Cal. Feb. 17, 2016)......................................................................14

*Wireless Discovery LLC v. eHarmony, Inc.*
No. 1-22-cv-480-GBW, 2023 WL 1778656 (D. Del. Feb. 6, 2023) .......................................12

Statutes and Codes

United States Code
Title 35, Section 101 ..........................................................................................................passim

Rules

Federal Rules of Civil Procedure
Rule 12(b)(6) ...................................................................................................................... 1, 2

-

## I.      INTRODUCTION

Implementing an abstract idea with conventional computer technology, even in a particular technology field, is not a patentable invention. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014). Since *Alice*, the Federal Circuit and district courts have repeatedly invalidated claims reciting abstract ideas implemented with generic computer technology, including at the pleading stage.

Recentive's patents—U.S. Patent No. 10,911,811 ("the '811 patent") (D.I. 1, Ex. A) and U.S. Patent No. 10,958,957 ("the '957 patent") (D.I. 1, Ex. B) (together, the "Patents-in-Suit")— recite exactly the types of claims now routinely held invalid under Section 101. The Patents-in-Suit are directed to a "computer implemented method" of generating a schedule of events in a way that optimizes a particular parameter—such as television ratings—and updating the schedule in response to changed conditions—*e.g.,* the weather—in real time. *See* D.I. 1 at ¶ 15. This is a long-standing human endeavor, which the Patents-in-Suit simply seek to automate by replacing a human decision-maker with generic machine learning techniques that are implemented via basic computing technology. The claims are therefore ineligible for patent protection under *Alice*.

Defendants accordingly move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), before the parties and the Court invest valuable time and resources litigating these invalid patents.

## II.      NATURE AND STAGE OF THE PROCEEDINGS

This case is in its early stages. Recentive filed its original complaint for patent infringement on November 29, 2022. D.I. 1. Defendants Fox Corporation and Fox Broadcasting Company were served on December 2, 2022. D.I. 6-7. The parties stipulated to an extension of time for Defendants to move, answer, or otherwise respond to the complaint through and including

1

February 10, 2023.  D.I. 8.  No schedule has been set and the parties have not yet commenced discovery.

## III.    SUMMARY OF ARGUMENT

1.    The claims of the Patents-in-Suit are directed to an abstract idea and claim nothing inventive to transform the abstract idea into a patent-eligible application.  Therefore, they are not eligible for patent protection and are invalid under 35 U.S.C. § 101.

2.    Patent eligibility under Section 101 is a threshold legal issue for the Court.  *See Bilski v. Kappos,* 130 S. Ct. 3218, 3225 (2010) (threshold test); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) (question of law).  Thus, it is appropriate for the Court to determine validity at the pleadings stage.

3.    Because it is apparent from the face of the Patents-in-Suit that the claims are not directed to eligible subject matter under § 101 and are invalid, it is appropriate to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## IV.    FACTUAL BACKGROUND

### A.    The Patents-in-Suit

The '811 patent, titled "Systems and Methods for Automatically and Dynamically Generating a Network Map," issued on February 2, 2021, from Application Ser. No. 16/598,480 filed on October 10, 2019.  The '957 patent issued on March 23, 2021, from Application Ser. No. 17/112,110, filed on December 4, 2020, and is a continuation of the '811 patent that shares the same title and specification as the '811 patent.  The independent claims (claims 1, 14) of the '957 patent are nearly identical to those (claims 1, 12) of the '811 patent.  *See* Ex. A (a comparison of independent claims 1 and 12 of the '811 patent), Ex.  B (a comparison of independent claims 1 and 12 of the '811 patent with independent claims 1 and 14, respectively, of the '957 patent).

The Patents-in-Suit are directed to computer-implemented methods for generating a "network map," which is a "schedule that outlines which content will be displayed on which channel at a certain time." *See* '811 patent at 1:14-17; D.I. 1 at ¶ 15. By way of example, the specification describes the needs of the National Football League ("NFL") to generate a network map for "the numerous NFL football games played on Sundays, many of which are played simultaneously," whereby the NFL "needs to determine which content (games) will be displayed on which channel (television channels) at which times (usually 1 pm and 4 pm ET)." *Id.* at 1:17-24. According to the Patents-in-Suit, conventional techniques are problematic because they are "entirely manual, static and incapable of responding to changing conditions . . . and unable to forecast the impact of a proposed schedule change." *Id.* at 1:24-29. The claimed solution of the Patents-in-Suit is to automate this process, based on "a computer algorithm designed to optimize a certain parameter (*e.g.,* highest overall projected ratings, highest projected ratings in a particular market, etc.)," and/or "based on real time data," whereby the network map "can be dynamically updated based on changing conditions (*e.g.,* an adjusted schedule, weather data, news data, etc.[])." *Id.* at 1:35-47; *see also* D.I. 1 at ¶ 16.

Claim 1 of the '811 patent is representative,[1] and recites a "computer-implemented method" capturing the broad functional concepts of "receiving" a schedule of live events starting at two different time slots (limitation 1[a]); assigning the events for each time slot to a plurality of

---

[1] This motion uses claim 1 of the '811 patent as representative because all of the claims of the Patents-in-Suit "are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.,* 776 F.3d 1343, 1348 (Fed. Cir. 2014). As shown in Exhibit A, the only substantive difference between independent claims 1 and 12 of the '811 patent is the addition of the limitation "one or more computer processors programmed to perform operations comprising" to claim 12. Further, the independent claims of the '957 patent are nearly identical to those of the '811 patent, with the only substantive difference being that the '811 patent is directed to "***live*** events" and the '957 patent is directed more generally to "events." *See* Ex. B (emphasis added).

tv stations in a plurality of cities (limitations 1[b]-[d]) using a "machine learning technique to optimize an overall television rating" to generate a network map (limitation 1[e]); and "automatically updating" the network map "on demand" and "in real time" based on changes to either the schedule or certain "underlying criteria" (limitations 1[f]-[h]).  In full, claim 1 reads:

> 1[*pre*] A computer-implemented method for dynamically generating a network map, the method comprising:
>
>> [a] receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time;
>>
>> [b] generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities,
>>
>>> [c] wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,
>>>
>>> [d] wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and
>>>
>>> [e] wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events;
>>
>> [f] automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,
>>
>>> [g] wherein updating the network map comprises updating the mapping of the first plurality of live events and the second plurality of live events to the plurality of television stations; and
>>
>> [h] using the network map to determine for each station (i) the first live event from the first plurality of live events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time.

'811 patent at 9:65-10:32 (lettering added).

The Patents-in-Suit do not disclose a particular computer system that performs the claimed method. Rather, the specification discloses "a generic computing device 450, which may be used with the techniques described in this disclosure" and then provides a general description of common computing components: a processor, memory, display, communication interface, and so on. *See* '811 patent at 5:4-6; 5:6-6:37; 6:39-49.

The Patents-in-Suit also do not provide any details of the algorithm that executes the claimed method. Rather, the specification recites a generic list of machine learning techniques and training data that may be used:

> In certain implementations, the computer algorithm can be developed using a machine learning technique. In general, any suitable machine learning technique can be used, for example, a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network, etc., as just a few examples. The machine learning technique can be trained using any suitable training data. A few non-limiting examples include weather data, news data, and/or gambling data (e.g., odds data generated by sports books).

'811 patent at 3:21-30.

### B. Prosecution History of the Patents-in-Suit[2]

During prosecution of the '811 patent, the United States Patent and Trademark Office initially rejected the pending claims as lacking patent-eligible subject matter:

> Claims 1-20 are rejected under 35 U.S.C. 101 because the claimed invention is directed to an abstract idea without significantly more. ***The claims recite receiving a schedule for events, generating a network map based on the schedule, and automatically updating the network map based on either a change to the schedule or updated data, which are all mental processes capable of being performed in the human mind or on pen and paper.*** This judicial exception is not integrated into a practical application because not only does the abstract idea of claims 1-13 fail to positively recite that a computer is actually executing the code the abstract idea represents, only that the code "can be" implemented by a computer, and the abstract

---

[2] The Court may consider the prosecution history as a matter of public record, including on a motion to dismiss under Section 101. *See Sound View Innovations, LLC v. Facebook, Inc.,* 204 F. Supp. 3d 655, 658 (D. Del. 2016) ("A court may also take judicial notice of the prosecution histories, which are 'public records.'") (citing cases).

idea of claims 14-20 merely recites a computer that is "programmed to perform" an operation rather than actually performing/executing the operation, claims 1-20 merely use a computer as a tool to perform an abstract idea. ***The claims do not include additional elements that are sufficient to amount to significantly more than the judicial exception because the machine learning technique cited in claims 11 and 13 are also interpreted as code written to allow a computer to learn a pattern using models, which is also interpreted as capable of being performed in the human mind or on pen and paper, and therefore also does not positively recite any computer executing the code***.

*See* Ex. C (January 31, 2020 Office Action) at 2 (emphases added).

In response, Applicant amended its pending claims and included the limitations "displaying the network map to a user on a display having a graphical user interface depicting" and "displaying an updated network map to the user on the display having the graphical user interface depicting the updated network map in chart format." *See* Ex. D (March 13, 2020, Response to Office Action) at 2-4. Applicant argued that "the newly added 'displaying steps' do not recite abstract ideas." *Id*. at 6. Focusing on these additional limitations, Applicant submitted that the claimed displaying steps "integrat[ed] the claimed subject matter into a practical application," and therefore rendered the claims patent eligible. *See id.* at 6-7 (citing *Trading Techs. Int'l, Inc. v. CQG, Inc.,* Case No. 2016-1616, 675 Fed. Appx. 1001 (Fed. Cir. Jan. 18, 2017)).

The claims were then rejected on a new ground—that the claims were indefinite under 35 U.S.C. § 112(b) and obvious under § 103. *See* Ex. E (June 23, 2020 Office Action) at 2-3. Applicant's arguments with respect to Section 101 were found to be moot in light of this new ground of rejection. *Id*. The amended claims were rejected on the basis that the new "displaying steps" limitations lacked support in the specification. *See* Ex. F (September 28, 2020 Office Action) at 3-4 ("While there is a general teaching of displaying data, there is no disclosure to support displaying the network map on a display of a client device.").

In view of this rejection and despite previously relying on the addition of its "displaying steps" to argue against the initial rejection under Section 101, Applicant subsequently deleted the

6

"displaying steps" limitations, and the '811 patent issued without these limitations. *See* Ex. G (October 27, 2020 Amendment and Response). The Patent Office did not revisit the Section 101 rejection during the remaining prosecution of the '811 patent.

The '957 patent, a continuation of the '811 patent, was allowed without any substantive Office Actions with respect to the issue of validity.

## V.    LEGAL STANDARD

The Supreme Court's *Alice* decision established a two-part framework for determining eligibility under Section 101. 573 U.S. at 217-18. First, a court determines whether the claims are "directed to" a patent-ineligible concept, such as an abstract idea. *Id*. If the claim is directed to an abstract idea, the Court proceeds to step two and asks whether the claim elements, considered "both individually and 'as an ordered combination,'" "transform the nature of the claim" into a patent-eligible application. *Id*. Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id.* at 222.

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *id*., and to "allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc*., 873 F.3d 905, 913 (Fed. Cir. 2017).

Because the ultimate question of whether a claim recites patent-eligible subject matter under Section 101 is a question of law, a district court may resolve the issue of patent eligibility by way of a motion to dismiss. *See, e.g., Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1351 (Fed. Cir. 2014) (affirming finding of ineligibility made on

7

12(b)(6) motion); *Genetic Techs. Ltd. v. Merial LLC.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) ("We have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion."). Claim construction is not a prerequisite to a Section 101 dismissal. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

## VI.    ARGUMENT

The Patents-in-Suit fail the *Alice* test. The claims all recite an abstract idea and claim nothing inventive—generating and updating a schedule of events—that is performed using generic machine learning techniques running on basic computing technology. Under well-established case law, such claims are not eligible for patent protection.

### A.    *Alice* Step One: The Claims Are Directed to an Abstract Idea

"The 'abstract idea' step of the [*Alice*] inquiry calls upon [the Court] to look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (quotation omitted). In deciding questions of patent eligibility, the Court may consider whether the steps of the claim "can be performed in the human mind, or by a human using a pen and paper," *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1317 (Fed. Cir. 2021) (internal citations omitted), compare the claims to those previously analyzed in other judicial decisions, *Elec. Power Grp., LLC v. Alstom S.A.,* 830 F.3d 1350, 1351–54 (Fed. Cir. 2016), or ask "whether the claims are directed to 'a specific means or method' for improving technology or whether they are simply directed to an abstract end-result," *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017). Further, manipulating and organizing data falls into "a

8

familiar class of claims 'directed to' a patent ineligible concept." *Elec. Power,* 830 F.3d at 1353.[3]

Applying this framework confirms that the Patents-in-Suit are directed to the mere automation of

steps that can and were previously manually performed by humans.

### 1. The Claims Are Directed to the Automation of an "Entirely Manual" Process

The Patents-in-Suit state that the claimed invention is directed to "an automated technique

for generating a network map"—a process that the Patents-in-Suit describe as previously being an

"entirely manual" process to assign content to be played on a certain channel at a certain time. *See*

'811 patent at 1:14-17, 24-29, 37-39.

For example, claim 1 involves four steps in creating a "network map" to "optimize an

overall television rating": (1) receiving a schedule of live events starting at two different time slots

(*i.e.,* limitation [1a]); (2) generating a network map by assigning events for each time slot and for

each television station (*i.e.,* limitation [1b]-[1d]); (3) using "a machine learning technique to

optimize an overall television rating" across the events in order to generate the network map (*i.e.,*

limitation [1e]); and (4) automatically updating the network map on demand and in real time based

on a change to the schedule or underlying criteria (*i.e.,* limitation [1f]-[h]). *See also* D.I. 1 at ¶ 16.

With the exception of the use of a "machine learning technique" in step 3, none of these

steps require the use of a computer and each of these steps can be performed in the human mind

or by a person using pen and paper. Indeed, the specification of the Patents-in-Suit confirms this:

the specification explains that the claimed invention is intended to replace "the current process

---

[3] *See also Content Extraction & Transmission LLC v. Wells Fargo Bank,* 776 F.3d 1343, 1347 (Fed. Cir. 2014) (holding the asserted claims were directed to "the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" and were not patent eligible); *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.,* 916 F.3d 1363, 1367-68 (Fed. Cir. 2019) (holding claims were not patent eligible because they were directed to collecting, manipulating, and displaying data).

[which] is entirely manual" with "an automated technique." *See* '811 patent at 1:24-29 and 1:37-43. The specification also describes that "[g]enerally, a network map is based upon an underlying schedule . . . [and] [i]n some instances, the underlying schedule can be generated using a conventional technique, ***e.g., manually***." *Id.* at 3:3-8 (emphasis added).

Thus, the steps of the claimed method are simply directed to automating existing human processes. The Federal Circuit has recognized these characteristics as a "telltale sign of abstraction." *PersonalWeb*, 8 F.4th at 1316 (claims for data management tools are "directed to a medley of [human] mental processes" and therefore abstract). Indeed, taking a manual process and automating it using generic computing components is quintessentially an abstract idea. *See, e.g., Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("With the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper.") (internal citation omitted); *see also, e.g., Mortg. Application Techs., LLC v. MeridianLink, Inc.*, 2021 WL 97347, at *4 (Fed. Cir. Jan. 12, 2021) ("We have previously held that a process that can be and has been performed by humans without the use of a computer . . . is an abstract idea."); *Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) (claims to facilitate anonymous loan shopping were abstract because they "could all be performed by humans without a computer"). And as this Court explained in *Blackbird Tech LLC v. Advanced Discovery Inc.*, "[h]umans have long been capable of sorting and organizing data, and using a computer to automate this concept is abstract." No. CV 16-413-GMS, 2017 WL 2734725, at *4 (D. Del. June 26, 2017); *see also Cogent Medicine, Inc. v. Elsevier Inc.*, 70 F. Supp. 3d 1058, 1063 (N.D. Cal. 2014) (claims for "maintaining and searching a library of information" abstract because they were

10

"little different than the basic concept of organizing a physical library" and merely "describe[d] a computerized method of performing the same task").

Moreover, the fact that the Patents-in-Suit include a bare recitation to the use of "a machine learning technique to optimize an overall television rating" (step 3) does not make the claims patentable. The specification makes it clear that the "machine learning techniques" are known mental processes such as a gradient boosted random forest, a regression, a neural network, a decision tree, a support vector machine, a Bayesian network; and that the techniques use known data sources such as weather data, news data, and/or gambling data. *See, e.g.,* '811 patent at 3:26-30. The analysis of such data using these techniques can be performed with a pen and paper by a person in place of the "machine learning technique"—albeit not with the speed of a computer. The Federal Circuit's "precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1370 (Fed. Cir. 2015). Moreover, this Court has held that "selecting information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis," without reciting an improved computer or network, is not sufficient to confer patent eligibility. *Nuance Comms., Inc. v. MModal LLC*, No. 1:17-cv-1484-MN-SRF, 2018 WL 6584129, at *7–8 (D. Del. Dec. 14, 2018) (*citing SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018)). *See also, e.g., Eagle View Technologies, Inc. et al. v. Roofr, Inc.*, No. 1-21-cv-01852-RGA, 2023 WL 315633, at *8 (D. Del. Jan. 19, 2023) (granting motion to dismiss under Section 101 on the grounds that the asserted claim, "apart from generic computer-implemented activities, recite processes that can be accomplished off the computer," and that the claim failed to "recite technological improvements or benefits beyond the use of the predominant pitch algorithm, which is itself an abstract idea.");

11

*Wireless Discovery LLC v. eHarmony, Inc.* No. 1-22-cv-480-GBW, 2023 WL 1778656, at *9 (D. Del. Feb. 6, 2023) (finding claims directed to the abstract idea of social networking not saved by the "recitation of data-processing steps, *e.g.,* sending, receiving, and processing data").  Thus, the addition of a generic machine learning algorithm to optimize a particular parameter in generating the network map does not remove the claims from the realm of an unpatentable abstract idea.

In sum, the claims of the Patents-in-Suit simply provide for a "computer implemented" version of a known human practice.  Therefore, the claims are directed to an abstract idea and are accordingly patent ineligible subject matter.

### B.    *Alice* Step Two: The Claims Include No Inventive Concept

Where, as here, the claims are directed to an abstract idea under step one, the inquiry moves on to whether the elements of the claims, considered "both individually and 'as an ordered combination,'" recite an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 218. The claims of the Patents-in-Suit lack an inventive concept because they do nothing more than state the abstract idea to be applied using a generic "computer" (or "computer processors"). *See Alice*, 573 U.S. at 217-18 (implementing abstract idea on conventional computers does not impart patent eligibility); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) (invalidating claims directed to implementing abstract idea "on a generic computer"); *Eagle View*, 2023 WL 315633, at *8 (finding that the recital of "conventional technology to implement conventional steps" was not enough to confer patent eligibility and invalidating claims that "apart from generic computer-implemented activities, recite processes that can be accomplished off the computer" as unpatentable abstract ideas); *Wireless Discovery*, 2023 WL 1778656, at *11 (finding that "computer components recited in the claims [that] are used for their conventional purposes" not sufficient to transform an abstract idea into an inventive concept).

12

### 1.    Recitation of a "Computer" or "Computer Processors" in the Claims of the Patents-in-Suit Do Not Confer Patent Eligibility

The independent method claims of the Patents-in-Suit (*i.e.,* claim 1 of the '811 patent and claim 1 of the '957 patent) recite that the claim is directed to a "computer-implemented method." Similarly, the independent system claims of the Patents-in-Suit (*i.e.,* claim 12 of the '811 patent and claim 14 of the '957 patent) recite "one or more computer processors programmed to perform operations comprising." Moreover, Plaintiff describes the invention of the Patents-in-Suit as a "computer algorithm" designed to optimize a particular parameter, which is developed using a machine learning-technique. *See* D.I. 1 at ¶ 17. Plaintiff also claims that these features are "directed to an improvement in the functioning [*sic*] of generating network maps, not to an abstract idea." *Id.* at ¶ 18.[4]

However, these generic references to a "computer" or "computer processor" fail to transform the claimed abstract idea into patent-eligible subject matter. The claims are not directed to an improvement in the functioning of a computer, but merely "add conventional computer components to well-known business practices." *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1260 (Fed. Cir. 2016). Instead, the claim language is entirely result-oriented, without identifying anything more than a proverbial "black box" for implementing the technique and revealing nothing about the inner workings of the box itself: the claims do not provide any information about how the computer is programmed to perform the algorithm, or how the computer is programmed to perform the abstract idea. Thus, the recitation of the "computer" or "computer

---

[4] As a separate matter, Plaintiff cannot avoid dismissal "simply by reciting in the complaint that the invention at issue is novel and nonconventional," but rather must offer "detailed factual allegations raising issues of fact." *Eagle View*, 2023 WL 315633, at *10 (citations and quotation marks omitted). Plaintiff's bare assertions in the complaint fail to transform the claims of the Patents-in-Suit into patent eligible subject matter because simply "[a]sserting an inventive concept without tethering it to the claims does not suffice." *Id.*

processors" limitations impart no "inventive concept" to the abstract idea. *See Alice*, 573 U.S. at 218 ("the computer implementation did not supply the necessary inventive concept . . . simply implementing a mathematical principle on a physical machine, namely a computer, [i]s not a patentable application of that principle"); *Dealertrack*, 674 F.3d at 1333 (ineligible claims failed to "specify how the computer [components] are specially programmed to perform" the abstract idea of an information clearinghouse).

The specification of the Patents-in-Suit likewise does not purport to describe any new or inventive computer. The only references to a "computer" or "computer processors" in the patent do not contemplate anything more than a generic and conventional computer. *See, e.g.,* '811 patent at 5:3-8:60. For example, the specification states "FIG. 4 shows an example of a ***generic*** computing device 450, which may be used with the techniques described in this disclosure." *Id*. at 5:4-6 (emphasis added). The specification also states more generally that "[i]mplementations of the subject matter and the operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structures disclosed in this specification and their structural equivalents, or in combinations of one or more of them." *Id*. at 6:39-44. As such, the Patents-in-Suit lack any inventive concept with respect to the "computer" or "computer processors" limitations. *See Alice*, 573 U.S. at 224 ("Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself.") (internal quotation marks and citations omitted); *see also Williamson v. Citrix Online, LLC*, 212 F. Supp. 3d 887, 902-03 (C.D. Cal. Feb. 17, 2016) ("to the extent the 'inventive concept' claimed in the '840 Patent is the ability to use industry-standard hardware and software to execute the abstract idea, the '840 Patent pre-empts

14

the field of generating and utilizing a virtual, interactive learning environment and runs afoul of Section 101.").

> ### 2.       Recitation of a "Machine Learning Technique" in the Claims of the Patents-in-Suit Does Not Confer Patent Eligibility

Each of independent claims of the Patents-in-Suit also recites the use of a "machine learning technique to optimize an overall television rating." *See also, e.g.,* D.I. 1 at ¶ 20 ("The use of machine learning techniques to generate network maps . . . provides an improvement to traditional, conventional techniques . . . ."). However, these generic references to a "machine learning technique" fail to transform the claimed abstract idea into patent-eligible subject matter. There is nothing inventive in using machine learning for optimization. But that is all the Patents-in-Suit describe—use of machine learning techniques for optimization of a schedule by reference to key parameters of interest, such as maximizing television ratings.

The recitation of "machine learning" in the Patents-in-Suit is similar to that of certain claims at issue in *Power Analytics Corporation v. Operation Technology, Inc.*, 2017 WL 5468179, at *6 (C.D. Cal. July 13, 2017), *aff'd sub nom*, Fed. Appx. 334 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 910 (2020). In *Power Analytics*, the Court found that the recitation of a "machine learning engine" did not turn an abstract idea into patentable subject matter:

> A few claims recite a "machine learning engine" ('608 claims 16-17; '395 claims 1, 3), but the patents describe this in functional terms, *e.g.*, '608 Patent, Fig. 22; 37:35-63, without purporting to add any particular inventive implementation. *Cf. In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613-15 (Fed. Cir. 2016) (in view of the patent's "abstract functional descriptions" of the claims' "telephone unit," "server," "image analysis unit," and "control unit," they "fail to add an inventive concept sufficient to bring the abstract idea into the realm of patentability.").

*Id.*

Similarly here, the Patents-in-Suit describe the use of a "machine learning technique" purely in functional terms (*e.g.,* "to optimize an overall television rating across the first plurality

15

of live events and the second plurality of live events") without adding any particular inventive implementation. Furthermore, the Patents-in-Suit provide no guidance on the selection of a particular machine learning technique or its use, stating that "any suitable machine learning technique can be used" and stating generally that "[t]he machine learning technique can be trained using any suitable training data." *See* '811 patent at 3:21-30. Thus, the recitation of a "machine learning technique" in the claims of the Patents-in-Suit also fails to render the claims patent eligible subject matter.

The *Power Analytics* decision is also instructive with respect to the claimed step of "automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria." *See also* D.I. 1 at ¶ 21 (claiming that "[n]etwork maps that automatically update on demand and in real time . . . provides an improvement to traditional, conventional techniques . . ."). In *Power Analytics*, the Court found that the claims at issue "focus on the idea of comparing live data to predicted data and updating a prediction model," and explained:

> The asserted claims are more like those in *Parker v. Flook*, 437 U.S. 584 (1978). There, the claimed idea was to collect data from a monitored industrial system, and analyze and compare it with other data. Depending on the outcome of that analysis, the claimed idea would update an alarm limit responsible for identifying alarm conditions to users. *Id*. at 596-98. Like the *Flook* claims, the claims here do not recite either unconventional physical elements or a functional relationship between abstract and physical elements. Rather, the "threshold, calibration, and synchronization" elements are abstract, generic steps that describe desired functions or outcomes, but do not, individually or in combination, constitute "inventive concepts."

*Power Analytics*, 2017 WL 5468179, at *6.

Thus, the bare recitation of a "machine learning technique" in the claims of the Patents-in-Suit fails to transform the abstract idea into patent-eligible subject matter.

16

3.      **The Order of the Steps of the Method Claimed in the Patents-in-Suit Does Not Confer Patent Eligibility**

When the steps of the method claimed in the Patents-in-Suit are considered "as an ordered combination," the recited limitations add nothing to the steps considered separately. *See Alice*, 573 U.S. at 224. That is, viewed as a whole, the claimed method simply recites the automation of a mental process that can be performed by a human person. *See id.* ("In short, each step does no more than require a generic computer to perform generic computer functions."). Thus, the ordered combination of the claimed steps does not impart patent eligibility to the Patents-in-Suit.

4.      **The Dependents Claims of the Patents-in-Suit Do Not Contain Any Inventive Concept**

The dependent claims of the Patents-in-Suit also fail to provide any inventive concepts that would transform the claimed abstract idea into patent-eligible subject matter. None of the dependent claims requires the use of a computer and each of the dependent claims can be performed in the human mind or by a person using pen and paper.

A large number of the dependent claims merely specify the type or source of information to be used in generating the network map. Dependent claims 2, 3, and 13 of the '811 patent and dependent claims 2, 3, 4, 5, 6, 15, 16, 17, 18, and 19 of the '957 patent merely specify the types of events that are to be scheduled (*e.g.,* "sporting events," "NFL games," "non-sporting events," and "dramatic television program, movie, or live streaming event").

Dependent claims 11 and 19 of the '811 patent and dependent claims 13 and 26 of the '957 patent merely specify that the first and second times occur on the same day.

Dependent claims 4 and 14 of the '811 patent provide only that "the network map comprises a description of which event will be displayed on which station at a particular time." Providing a "description" of the event to be displayed provides little that is meaningful beyond the claimed method and is merely an existing, well-known, conventional practice when scheduling

17

television content. *See Content Extraction & Transmission LLC v. Wells Fargo Bank,* 776 F.3d 1343, 1348 (Fed. Cir. 2014) ("There is no 'inventive concept' in . . . well-understood, routine, and conventional activities commonly used in industry.").

Dependent claim 5 of the '811 patent specifies that the "change to the schedule comprises a manual change performed by a user"—a manual step that can be performed in the human mind or by a person using pen and paper and thus does not transform the abstract method of the independent claims of the Patents-in-Suit into patent-eligible subject matter.

Plaintiff relies on dependent claims 6, 7, 8, and 9 of the '811 patent and claims 7, 8, 9, and 12 of the '957 patent to argue that the claims are "directed to an improvement in the functioning [*sic*] of generating network maps, not to an abstract idea." *See* D.I. 1 at ¶¶ 18-19. However, these claims are not sufficiently tied to a specific improvement in technology so as to confer patent eligibility.

Dependent claims 6 and 15 of the '811 patent and claims 7 and 20 of the '957 patent require "generating the network map based on at least one of weather data, news data, or gambling data." Such limitations are insufficient to transform an abstract claim into patent eligible subject matter. As the *Power Analytics* court explained:

> In *Electric Power Group*, the court noted that a field-of-use restriction, "limiting the claims to the particular technological environment of power-grid monitoring," is insufficient. The same rule applies to collecting and analyzing specific "types of information" from specific types of "information sources" (including "real time measurements") because "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id*. at 1355.

*See Power Analytics*, 2017 WL 5468179, at *5 (internal citations omitted).

Dependent claim 7 of the '811 patent and dependent claims 8 and 21 of the '957 patent require that "the step of automatically updating the network map comprises optimizing the network

18

map based on a particular parameter." And dependent claims 8 and 16 of the '811 patent and dependent claims 9 and 22 of the '957 patent require that "the particular parameter comprises the overall rating or a projected rating in a certain market for the plurality of television stations." These limitations fail for the same reason that optimizing "an overall television rating" when generating the network map fails in the independent claims—they are a step that, on their face, do not require the use of a computer and can easily be performed in the human mind or by a person using a pencil and paper.

Dependent claims 9 and 17 of the '811 patent and dependent claims 12 and 25 of the '957 patent require first "generating the schedule for the first plurality of live events and the second plurality of live event." Again, the generation of schedule can easily be performed in the human mind or by a person using a pencil and paper. Indeed, the specification of the Patents-in-Suit explains "[i]n some instances, the underlying schedule can be generated using a conventional technique, e.g., manually." *See* '811 patent at 3:6-8.

The remaining dependent claims fare no better. Dependent claim 10 of the '811 patent and dependent claim 18 of the '957 patent requires "generating multiple network maps based on multiple user entered changes." Dependent claims 10 and 23 of the '957 patent also provide that "the network map is automatically updated based on the change to the schedule." While dependent claims 11 and 24 of the '957 patent require that "the network map is automatically updated based on the change to . . . a user-submitted rule." The fact that claimed process is repeated multiple times to create a network map or is done automatically in response to a change does not transform the claimed process into patent-eligible subject matter. As before, these are steps that can be carried out entirely by a person without the aid of a computer. Furthermore, to the extent that using a computer makes the automatic generation of network maps or the generation of multiple

19

network maps faster, such is also insufficient as the "precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea." *Intellectual Ventures I LLC*, 792 F.3d at 1370.

In sum, the other claims, like representative claim 1 of the '811 patent, are directed to an abstract idea and do not recite any specific improvement in technology. Thus, the remaining claims of the Patents-in-Suit do not change the patent eligibility calculus.

## VII.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant the instant motion, find the Patents-in-Suit are invalid for failing to claim patent eligible subject matter pursuant to 35 U.S.C. § 101, and dismiss with prejudice Recentive's complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Dated:  February 10, 2023

 */s/Francis DiGiovanni*

Francis DiGiovanni (No. 3189)
Thatcher A. Rahmeier (No. 5222)
Faegre Drinker Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 467-4200
francis.digiovanni@faegredrinker.com
thatcher.rahmeier@faegredrinker.com

Michael E. Zeliger (*pro hac vice*)
Ranjini Acharya  (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
2550 Hanover Street
Palo Alto, CA 94304
(650) 233-4500
michael.zeliger@pillsburylaw.com
ranjini.acharya@pillsburylaw.com

Evan Finkel (*pro hac vice*)
Michael S. Horikawa (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
725 S Figueroa St – 36th Floor
Los Angeles, CA 90017
(213) 488-7307
evan.finkel@pillsburylaw.com
michael.horikawa@pillsburylaw.com

*Attorneys for Defendants Fox Corporation and
Fox Broadcasting Company LLC*

21

**Exhibit A: Comparison of Claim 1 with Claim 12 of the '811 Patent**

| US Patent No. 10,911,811 | US Patent No. 10,911,811 |
|---|---|
| 1. A *computer-implemented method* for dynamically generating a network map, the method comprising: | 12. A *system* for dynamically generating a network map, the system comprising:<br><br>*one or more computer processors programmed to perform operations comprising:* |
| receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time; | receiving a schedule for a first plurality of live events scheduled to start at a first time and a second plurality of live events scheduled to start at a second time; |
| generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities, | generating, based on the schedule, a network map mapping the first plurality of live events and the second plurality of live events to a plurality of television stations for a plurality of cities, |
| wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities, | wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities, |
| wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and | wherein the network map identifies for each station (i) a first live event from the first plurality of live events that will be displayed at the first time and (ii) a second live event from the second plurality of live events that will be displayed at the second time, and |
| wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events; | wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events; |
| automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria, | automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria, |
| wherein updating the network map comprises updating the mapping of the first plurality of | wherein updating the network map comprises updating the mapping of the first plurality of |

1

| US Patent No. 10,911,811 | US Patent No. 10,911,811 |
|---|---|
| live events and the second plurality of live events to the plurality of television stations; and<br><br>using the network map to determine for each station (i) the first live event from the first plurality of live events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time. | live events and the second plurality of live events to the plurality of television stations; and<br><br>using the network map to determine for each station (i) the first live event from the first plurality of live events that will be displayed at the first time and (ii) the second live event from the second plurality of live events that will be displayed at the second time. |

2

**Exhibit B: Comparison of Claims 1 and 12 of the '811 Patent with Claims 1 and 14, Respectively, of the '957 Patent**

| US Patent No. 10,911,811 | US Patent No. 10,958,957 |
|---|---|
| 1. A computer-implemented method for dynamically generating a network map, the method comprising: | 1. A computer-implemented method for dynamically generating a network map, the method comprising: |
| receiving a schedule for a first plurality of *live* events scheduled to start at a first time and a second plurality of *live* events scheduled to start at a second time; | obtaining a schedule for a first plurality of events scheduled to start at a first time and a second plurality of events scheduled to start at a second time; |
| generating, based on the schedule, a network map mapping the first plurality of *live* events and the second plurality of *live* events to a plurality of television stations for a plurality of cities, | generating, based on the schedule, a network map mapping the first plurality of events and the second plurality of events to a plurality of television stations for a plurality of cities, |
| wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities, | wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities, |
| wherein the network map identifies for each station (i) a first *live* event from the first plurality of *live* events that will be displayed at the first time and (ii) a second *live* event from the second plurality of *live* events that will be displayed at the second time, and | wherein the network map identifies for each station (i) a first event from the first plurality of events that will be displayed at the first time and (ii) a second event from the second plurality of events that will be displayed at the second time, and |
| wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of *live* events and the second plurality of *live* events; | wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of events and the second plurality of events; |
| automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria, | automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria, |
| wherein updating the network map comprises updating the mapping of the first plurality of *live* events and the second plurality of *live* | wherein updating the network map comprises updating the mapping of the first plurality of events and the second plurality of events to the plurality of television stations; and |

1

| US Patent No. 10,911,811 | US Patent No. 10,958,957 |
|---|---|
| events to the plurality of television stations; and<br><br>using the network map to determine for each station (i) the first *live* event from the first plurality of *live* events that will be displayed at the first time and (ii) the second *live* event from the second plurality of *live* events that will be displayed at the second time. | using the network map to determine for each station (i) the first event from the first plurality of events that will be displayed at the first time and (ii) the second event from the second plurality of events that will be displayed at the second time. |
| 12. A system for dynamically generating a network map, the system comprising:<br><br>one or more computer processors programmed to perform operations comprising:<br><br>receiving a schedule for a first plurality of *live* events scheduled to start at a first time and a second plurality of *live* events scheduled to start at a second time;<br><br>generating, based on the schedule, a network map mapping the first plurality of *live* events and the second plurality of *live* events to a plurality of television stations for a plurality of cities,<br><br>wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,<br><br>wherein the network map identifies for each station (i) a first *live* event from the first plurality of *live* events that will be displayed at the first time and (ii) a second *live* event from the second plurality of *live* events that will be displayed at the second time, and<br><br>wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of live events and the second plurality of live events; | 14. A system for dynamically generating a network map, the system comprising:<br><br>one or more computer processors programmed to perform operations comprising:<br><br>obtaining a schedule for a first plurality of events scheduled to start at a first time and a second plurality of events scheduled to start at a second time;<br><br>generating, based on the schedule, a network map mapping the first plurality of events and the second plurality of events to a plurality of television stations for a plurality of cities,<br><br>wherein each station from the plurality of stations corresponds to a respective city from the plurality of cities,<br><br>wherein the network map identifies for each station (i) a first event from the first plurality of events that will be displayed at the first time and (ii) a second event from the second plurality of events that will be displayed at the second time, and<br><br>wherein generating the network map comprises using a machine learning technique to optimize an overall television rating across the first plurality of events and the second plurality of events; |

2

| US Patent No. 10,911,811 | US Patent No. 10,958,957 |
|---|---|
| automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of *live* events and the second plurality of *live* events to the plurality of television stations; and

using the network map to determine for each station (i) the first *live* event from the first plurality of li *live* ve events that will be displayed at the first time and (ii) the second *live* event from the second plurality of *live* events that will be displayed at the second time. | automatically updating the network map on demand and in real time based on a change to at least one of (i) the schedule and (ii) underlying criteria,

wherein updating the network map comprises updating the mapping of the first plurality of events and the second plurality of events to the plurality of television stations; and

using the network map to determine for each station (i) the first event from the first plurality of events that will be displayed at the first time and (ii) the second event from the second plurality of events that will be displayed at the second time. |

3